## JOLLAY v. STATE.*

## (*Knoxville.*   September Term, 1914.)

1. HOMICIDE.   Evidence.   Dying declarations.

 The admissibility of a purported dying declaration is a question for the court, while the weight of the declaration is for the jury.   (*Post, pp.* 298-300.)

2. HOMICIDE.   Evidence.   Dying declarations.

 The burden is upon the party offering a purported dying declaration to show that it was made in *articulo mortis*, that deceased was fully conscious of his impending death, and that he had sufficient mental capacity to comprehend the nature of his statements, although, if nothing appears to suggest a doubt of his capacity, the general presumption of sanity will suffice.   (*Post, pp.* 298-300.)

3. HOMICIDE.   Evidence.   Dying declarations.

 Where deceased was anæsthetized shortly after the shooting, and after he recovered from the anæsthetic he was given opiates up to the time of his death, which induced a fitful sleep, the burden is upon the one offering a dying declaration to show that deceased was rational when he made it.   (*Post, pp.* 300-305.)

 Case cited and approved:   Bell v. State, 72 Miss., 507.

4. HOMICIDE.   Evidence.   Dying declarations.   Sufficiency of evidence.

 In a prosecution for homicide, preliminary evidence of the mental capacity of deceased *held* insufficient to justify the admission of a purported dying declaration.   (*Post, pp.* 300-305.)

5. HOMICIDE.   Evidence.   Dying declarations.

 In determining whether the preliminary proof of the capacity of the deceased, whose dying declaration was offered, was sufficient, the failure of the State to introduce all of the witnesses present

---

*The authorities on the question of the admissibility of dying declarations, in general, are gathered in an extensive note in 56 L. R. A., 353.

Jollay v. State.

when the declaration was made can be considered as a circumstance against it. (*Post, pp.* 305, 306.)

Case cited and approved: Standard Oil Co. v. State, 117 Tenn., 625.

6. HOMICIDE.   Evidence.   Dying declarations.

While a dying declaration elicited by leading questions is not inadmissible for that reason, the declaration, to be admitted, must be such that the declarant could have testified to the same matter had he been called in court. (*Post, pp.* 306-309.)

7. HOMICIDE.   Appeal.   Harmless error.

Where there was much evidence to justify accused's claim of self-defense, the erroneous admission of a dying declaration wherein accused's victim stated that accused shot without provocation is prejudicial. (*Post, pp.* 309, 310.)

---

FROM KNOX.

---

Error to the Criminal Court, Knox County.—T. A. R. NELSON, Judge.

R. L. CATES, for Jollay.

WM. H. SWIGGART, JR., assistant attorney-general, for the State.

MR. JUSTICE FAW delivered the opinion of the Court.

The plaintiff in error, Walter Jollay, has appealed from a judgment of the criminal court of Knox county sentencing him to life imprisonment for the murder of Ben Anderson. Plaintiff in error admits that he shot Ben Anderson at the time and place claimed by

the State, and he does not controvert the fact, which is clearly proven, that Anderson died on the day following the shooting, from the effect of the wounds thus inflicted by plaintiff in error.

Plaintiff in error and Ben Anderson both lived in the neighborhood of Chilhowee Park, or the race track, near Knoxville. Anderson was a little more than twenty-four years old at the time of his death. Plaintiff in error was about thirty years old. Plaintiff in error was, at the time of the homicide, employed by his father, J. E. Jollay, in a grocery store belonging to J. E. Jollay, at Burlington, a station, or stopping place, on the line of the Knoxville Street Railway, near the race track. The shooting occurred about 7:30 o'clock in the evening of Sunday, December 21, 1913, on the porch of J. E. Jollay's store above mentioned. Jollay's store was alongside the track of the street railway company, and it seems that a covered porch or platform of the store building was used as a kind of passenger station by persons entering or leaving the street cars at Burlington.

Immediately after the shooting, Anderson was taken to the home of George Mynatt, a short distance from Jollay's store, and Dr. Walter Luttrell was called to see him at that place. After a superficial examination of Anderson's wounds, he was taken, at the instance of Dr. Luttrell, to Lincoln Memorial Hospital, where an operation was performed later, on the same night. Anderson died on the following day, December 22d, at the hospital. About an hour before his death, he made

a statement purporting to be an account of the circumstances attending the shooting, which was admitted to the jury as a dying declaration.

A general statement of some features of the evidence is necessary to an understanding of certain matters which are made the basis of assignments of error in this court.

Aside from the dying declaration of Ben Anderson, the only direct evidence of the manner in which the homicide occurred is contained in the testimony of John Gorman and Mrs. Tennie Kelly, witnesses for the State, and the testimony of the plaintiff in error in his own behalf.

The theory of the State is that the shooting was willful, deliberate, premeditated, and of malice aforethought, and therefore murder in the first degree.

On the other hand, the plaintiff in error insisted in his testimony before the jury, and through his counsel before this court, that he shot Ben Anderson because he believed, on reasonable grounds, that it was necessary to shoot Anderson in order to save himself from death or great bodily harm at the hands of Anderson.

The motive which the State attributes to the plaintiff in error for killing Anderson is that plaintiff in error held a grudge against Anderson, the deceased, growing out of the fact that plaintiff in error, some time prior to the homicide, had been charged with a violation of the age of consent law, and had left the State for a time, and that Anderson, the deceased, had

"turned him up." Bob Brown, a witness for the State, testified that something like a year before the homicide he was talking with plaintiff in error, and that plaintiff in error was drinking, and said that it would not be good for the man who "turned him up," if he knew who it was. Brown says that he had had a few drinks himself, and that he told plaintiff in error that he need not be hunting for the man that "turned him up;" that he (Brown) and Ben Anderson had "turned him up."

The plaintiff in error denied that he had a conversation with Bob Brown of the character related by Brown, and denied that he had ever had any information to the effect that the deceased had been in any way instrumental in "turning him up" on the charge referred to in the testimony of Bob Brown.

The theory of plaintiff in error, in support of which he introduced much evidence before the jury, was, and is, that the deceased entertained a deep-seated hostility toward plaintiff in error, and had made numerous threats of personal violence against plaintiff in error, on account of the following circumstances, that is to say: That deceased was one of a company of five or six young men who lived in the neighborhood of Jollay's store and associated much together; that these young men called themselves the "rounders;" that the rounders were in the habit of meeting on occasions, usually at night, in the neighborhood of Jollay's store, and engaging in drunken carrousels, to the great disturbance of the neighborhood; that prior to

Jollay v. State.

the time the father of plaintiff in error began business at Burlington the building occupied by him had been occupied by parties who conducted therein a "soft drink stand," and sold intoxicants, and that prior to Jollay's occupation of the building the rounders had been in the habit of engaging in boisterous and disorderly conduct in said building; that when Jollay took charge of said store, he at once took steps to suppress the disorderly conduct of the rounders, and that on one occasion the deceased and other rounders were drinking and disorderly in Jollay's store, and, at the instance of Mr. Jollay, the deceased, and perhaps others, were arrested and removed by officers summoned to the store for that purpose; that after his arrest, as above stated, the deceased uttered repeated threats against the Jollays, some of which were directed particularly against the plaintiff in error, Walter Jollay, and that deceased stated that the rounders had been running the place (referring to Jollay's store and vicinity) for five years, and that they were going to continue to do so.

With the foregoing general statement of the contentions of the parties in respect of their situation and mental attitudes, respectively, we now come to the immediate facts of the homicide.

John Gorman testified that he was standing on the platform or porch of Jollay's store engaged in conversation with the deceased, Ben Anderson, and Jim Kelly when plaintiff in error came up; that Sandy Kelly was also there; that plaintiff in error first had a conversa-

tion with Jim Kelly about some pennies which Jim
Kelly had; that "in a little bit" Jim Kelly left on a
passing street car and Sandy Kelly "went down the
road" towards his home; that immediately after the
Kellys left, plaintiff in error asked, "Where are they
all going?" that he (Gorman) inquired who plaintiff in
error referred to, and plaintiff in error replied, "Them
fellows that was raising the trouble around here,"
whereupon witness said that he had not seen any
signs of trouble or disturbance; that plaintiff in error
then said that he had orders to keep people who were
raising a disturbance off that porch, and witness re-
plied that the traction company put that platform there
for the public, and witness got on there once a day and
got off there once a day, and he guessed there would
be some way fixed for him to get on the car; that about
the time witness made the latter remark, deceased
struck a match, and plaintiff in error leaned up against
the wall near the corner of the store building and said
to deceased, "What in the hell was that you said about
me?" that deceased replied, "I ain't said anything
about you;" that plaintiff in error then said, "You are
a — — liar," and instantly drew a pistol from his
right coat pocket and fired two shots in rapid succes-
sion at deceased, who was standing near the outer edge
of the platform only a few feet from plaintiff in error;
that after the first two shots there was a momentary,
but perceptible, intermission, during which witness
stepped towards deceased, who was sinking down on
his hands and knees, and then plaintiff in error fired

a third shot, which witness thought passed through a coat which he (Gorman) had across his arm, and that plaintiff in error then said to witness, ''Take him and go on away from here, or I will kill both of you; whereupon witness took hold of deceased and led him up the road to George Mynatt's house. Gorman testified further that at the time plaintiff in error fired the first two shots the deceased was in the act of lighting a cigarette which he held between his lips, and that he had both hands up before his face, with a lighted match between his fingers, apparently unconscious of the threatening attitude of plaintiff in error. Gorman also stated that when the first two shots were fired and deceased was sinking down, he said: ''Don't shoot me any more; you have killed me now.''

Mrs. Tennie Kelly, witness for the State, testified that she saw the shooting. She said that one of her sons came home and told her that her son Jim was at Jollay's store, and that she had better go get him as quick as possible, and that she, knowing her son's temper and disposition, and not wanting him to get into ''any more trouble,'' started at once to Jollay's store, but when she reached a point on the opposite side of the pike from the store, she stopped behind a post, the location of which she described in her testimony, and saw three, and only three, persons at the store, whom she recognized as the plaintiff in error, the deceased, and the witness John Gorman; that plaintiff in error was leaning up against the corner of the storehouse, with Gorman standing near him, and deceased standing out

in front of the other two, and Mrs. Kelly's testimony as to what was said between plaintiff in error and deceased and the manner in which the shooting occurred is the same in all its details, as that of John Gorman.

The dying declaration of Ben Anderson was proven by the testimony of Mr. William Meyerhoff, and appears in Mr. Meyerhoff's testimony as follows:

"Q. State all he said, beginning with the commencing of the trouble out there? A. He made substantially the following dying declaration (that is, with respect to the time just preceding the shooting and during the occurrence): That he had a lighted match in his hand preparatory to lighting a cigarette; that Walter Jollay came up and said to him, 'Anderson, what is that you have been saying about me, Ben?' that Ben replied, 'Why Walter, I haven't said a thing about you;' that when Ben replied, Walter said, 'You are a God damn liar,' and immediately drew his pistol from his right coat pocket and shot twice at Anderson; that between the second and third shots that Anderson said, 'You have killed me already; don't shoot any more;' that Walter thereupon fired the third shot. Q. Now, then, stop right there— A. I will furthermore state that Anderson stated that he wasn't doing anything to Jollay at the time, or saying anything to him. Q. Said that he wasn't doing anything to Jollay or wasn't saying anything to him at the time of the shooting? A. Yes, sir; that is correct."

Walter Jollay, plaintiff in error, testified that a few minutes before the shooting occurred he started from

his home to go to the Baptist Church, which was be-
yond his father's store, and his attention was at-
tracted to the store by the noise of boisterous talk-
ing about the store; that when he reached the store
he found John Gorman, Jim Kelly, Sandy Kelly, and
the deceased, Ben Anderson, engaged in loud talking,
mingled with profanity; that he appealed to deceased
and his companious to be quiet and disperse, stating
to them that the good people in the neighborhood com-
plained about "the crowd hanging around on the store
porch" when church services were in progress; that the
Kelly boys left at once, Jim boarding a street car, and
Sandy walking away in the direction of his home; that
after the Kelly boys left Gorman began "cursing and
abusing" plaintiff in error, and said that that platform
belonged to the traction company, and he would "do
as he damn please" there; that deceased "spoke up
and said the same thing;" that "one word brought on
another" until deceased said, "You can't order me
anywhere," and with an oath applied an extremely
offensive epithet to plaintiff in error, and simultane-
ously turned his left side to plaintiff in error and
placed his hand in his hip pocket, whereupon plaintiff
in error drew his pistol and fired three times; that he
(plaintiff in error) did not know until the third shot
was fired that any of his shots had taken effect; that
Gorman ran away as soon as the shooting began; that
deceased did not fall, or sink down, but walked off in
the direction Gorman had gone, and joined Gorman up
the road a short distance, when Gorman threw his arms

around deceased and they walked away together. Plaintiff in error denied that deceased was lighting a cigarette, or had his hands up to his face, when the shooting began. He said that he shot deceased because he believed that deceased was going to shoot him.

Dr. Luttrell testified that the ball which inflicted the fatal wound entered the left side of deceased, under the tenth rib, and passed through the body to the right side, and that it ranged slightly toward the rear of the body, and slightly downward. Speaking more in detail, Dr. Luttrell says that the ball just mentioned "went through the left side into the stomach, making a small entrance hole; then passed over to the right side of the stomach to the outer wall in the right side about three or four inches long; then it went on and tore a hole in the liver; then through the large intestine on the right side."

Dr. Luttrell also states that there was "another wound in his left knee and in his right knee." Although it does not clearly appear, we infer from the evidence that the wound in the left knee and the one in the right knee were made by the same ball.

There is no direct proof that deceased was armed at the time of the homicide. John Gorman testified that he took deceased to the house of George Mynatt immediately after the shooting, and that deceased was not armed. George Mynatt testified that when Gorman brought deceased to his (Mynatt's) house, he assisted in putting deceased in the bed, and had his hands on the person of deceased, and did not discover

any weapons, but Mynatt stated that he did not put his hands in the pockets of deceased. It is urged on behalf of plaintiff in error that John Gorman was extremely hostile to plaintiff in error and friendly to the deceased, and the theory of plaintiff in error is that Gorman removed Anderson's pistol from his person immediately after the shooting.

The truth of the testimony of John Gorman and Mrs. Tennie Kelly was vigorously assailed by the defense on the trial below. An effort was made to destroy the evidence of Mrs. Kelly by showing that Mrs. Kelly was not at the point where she placed herself at the time of the shooting. It was sought to show this by two witnesses who passed down the pike from Jollay's store towards Mrs. Kelly's home, immediately before the shooting, and who heard the shots fired, and who stated that they did not meet, or see Mrs. Kelly. Five or six witnesses also testify to experiments made by them under conditions similar to those prevailing at the time of the shooting, and they say that it was impossible for one standing at the point where Mrs. Kelly placed herself to recognize, or discern the movements of, any person or persons on the porch at Jollay's store. The plaintiff in error also sought to destroy the probative value of John Gorman's testimony by evidence tending to show: (1) That he was an habitual drunkard, and that his general character was bad; (2) that he was drunk at the time of the shooting; and (3) that he was extremely hostile to the plaintiff in error and friendly to the deceased.

A number of witnesses testified for the plaintiff in error in support of the attacks made upon the testimony of John Gorman and Mrs. Kelly in the respects above indicated; and a number of witnesses also testified on behalf of the State with a view to support Gorman and Mrs. Kelly.

The foregoing general statement of the evidence has not been made with a purpose to express an opinion concerning the weight or preponderance of the evidence upon the one side or the other, but in order that the materiality and importance of certain rulings of the court below in the progress of the trial may be made apparent.

The admission in evidence over the objection of defendant below, of the testimony of William Meyerhoff, offered to prove a dying declaration by the deceased, Ben Anderson, is assigned as error. This assignment of error is predicated upon two grounds, viz.: (1) That the declarant was not rational, and did not have sufficient mental capacity to make a declaration; and (2) that the statement to which Mr. Meyerhoff testified was not the statement of the declarant Anderson, but was a statement previously made in writing by the witness John Gorman, and suggested to Ben Anderson, and that it was not competent to prove, as a dying declaration, a statement made in such way and manner as that appearing in this case.

The admissibility of a statement offered in evidence as a dying declaration is a question primarily for the court, and when the declaration has been admitted as

competent evidence, it is for the jury to judge of its weight.

The burden is upon the party offering the declaration to establish a proper predicate for its introduction. He must, as a condition precedent to its admission to the jury, show affirmatively that the declarant was in *articulo mortis*, and that he was fully conscious of his impending death, not as a matter of surmise and conjecture, but as a fixed and inevitable fact. The court must also be satisfied that the declarant had sufficient mental capacity to comprehend the nature of his statements; but on this point, if nothing appears, either by way of direct evidence or of circumstance, to suggest a doubt of his mental capacity, the general presumption which obtains in favor of sanity will suffice, and it will be presumed that he possessed sufficient intelligent consciousness to correctly remember and accurately narrate the facts. But if it appears that the injury sustained by the deceased, or the administration of anaesthetics, opiates, or narcotics, or other causes, either separately or combined, were calculated to derange his mental faculties, or if it appears that, in close proximity in point of time to the declaration, the declarant was alternately rational and irrational, then it is incumbent upon the party offering the declaration to show, by competent evidence, that the declarant was of sane mind, and had sufficient consciousness and intelligence to make a declaration understandingly.

Bearing in mind these general principles, which we think well sustained by sound reason and authority, let us examine the facts of the present case.

The statement of Ben Anderson, the deceased, which was admitted as a dying declaration, was proven by one witness alone, viz., Mr. Wm. Meyerhoff, a court reporter, and a member of the Knoxville bar. Mr. Meyerhoff testified that, in response to a request made by Mr. Fred Houk, one of the attorneys for the State in this cause, he made two trips to Lincoln Memorial Hospital on December 22, 1913, for the purpose of taking a statement from Ben Anderson; that the first trip was made about 10 o'clock in the morning, but that he did not take a statement at that time, because Anderson was not then prepared to make a statement, it being explained to the witness by Mr. Houk that Anderson could not make a statement until he could make it with a knowledge that he was going to die; that he returned to the hospital about half past 12 o'clock; and that, upon the second trip, the question was asked Anderson if he wanted to make a dying declaration, and Anderson said that he was going to die, and that he was dying, and then made the declaration which has already been set out in full herein.

Mr. Meyerhoff was asked the following question, viz.: "State to the court whether or not at the time Anderson made this statement he was rational and in his right mind." And he replied, viz.: "I think that is a question for the jury, whether he was rational or not."

The witness was then asked to state what Anderson said and did, and stated, as already indicated, that Anderson said, in response to a question, that he was going to die, and thereupon made a dying declaration or statement. The witness was then asked the following question, "After he made that dying declaration and statement, did he do anything relative to any other paper, as to a will or anything of that kind?" and answered, "He did."

The foregoing is all that is disclosed by the testimony of Mr. Meyerhoff which tends to throw any light upon the mental condition of Ben Anderson at the time the declaration in question was made.

Dr. Walter Luttrell, a witness for the State, testified with reference to the condition of Ben Anderson while at the hospital as follows, viz.:

"Q. How many times did you see Ben Anderson, Doctor, while he was in the hospital? A. Well I operated on him that night when he was hurt, and I stayed with him, I guess, until 1 o'clock. Q. Was he rational during that time? A. We gave him an anæsthetic, and of course he was under the anæsthetic possibly an hour or an hour and a half—something like that; then we took him to a room and I stayed with him until he waked up. Q. What time was that? A. About 1 o'clock at night; he was rational then; I didn't see him any more until, I believe, I was there next morning about 8; then I saw him again at 12:30. Q. Was he rational then, Doctor? A. At 12:30? Well, he would sleep a little—maybe mutter in his sleep; then

in a few minutes he would wake up and call for water, and stay awake; well, I would say he was rational then. Q. Were there or not times, Doctor, when he would be rational, and then times when he would not be rational—would he or not alternate between these two conditions? A. Yes, sir. Q. Would he alternate, Doctor, thus during the next day? A. Yes; sure. Q. Was he or not under the effects of opiates the next day? A. Yes, sir; he was. Q. All during the day? A. We gave him some for his pain. Q. He would be under the effect of the narcotic you would give him during the whole day? A. No; not all day; because we gave him very small doses as a general rule, from a half to an hour apart, and if he got to hurting too much, we gave him a little more; that is my recollection. Q. Was he irrational the next afternoon part of the time? A. Yes, sir. Q. You saw him at 12:30 and he was irrational or was out of his mind? A. I said he would go off to sleep, then mutter in his sleep a few minutes, and wake up and call for water, and we gave him some water, and he would talk sensible a minute or two, then go off to sleep again. Q. Did he or not alternate between these two states—rationality and irrationality? A. Yes, sir. Q. Did you or not hear him say he had not had any water for eighteen days? A. No; I didn't hear him say that.

### REDIRECT EXAMINATION.

"Q. He died in Knox county? I don't remember whether I asked you that question or not? A. Yes,

sir.  Q. You were not at the hospital when Mr. Meyer-
hoff and others were there and he made this statement?
A. No, sir.  Q. You didn't come until after they left?
A. I don't know whether you were there before or
afterwards; I left there at 12:30.  Q. He was rational
then, you say, Doctor?  A. Yes; at times.  Q. When-
ever he would wake up he appeared to be rational and
lucid and in his right mind; it was when he went to
sleep that he would mutter?  A. Yes; he would sleep
and maybe muttering along; then wake up and ask
for water.

### RECROSS-EXAMINATION.

"Q. Was he irrational the last time you saw him?
A. No; I talked to him when he was awake, and I told
him I would be back to see him after while, and he said,
'All right; come back to see me.'  Then I left.  I was
there about a half of an hour.  Q. How long would
these periods of rationality last, Doctor?  A. Oh, I
couldn't tell exactly, because I didn't pay much atten-
tion to it; just when he would wake up, you know, and
ask for a drink of water, he would be rational a few
minutes; then he would be irrational for a while.  Q.
Then become irrational?  A. Yes, sir; he would drop
off to sleep and mutter in his sleep; of course, he was
suffering from shock and loss of blood.  Q. Was he
or not, Doctor, during the next day, under the influ-
ence of narcotics?  A. Yes; we gave him a little mor-
phine along, you know, to stop the pain; he was suffer-
ing a great deal.  Q. And did you or not keep him

under the influence of morphine during the next day?
A. Not every minute; we gave him some; then it would
wear off every hour or so.   Q. Then you would give
him another dose?   A. Then he would get to suffering
so much and we would give him another dose.   If I
had the chart I could tell more about the exact amount
of doses given.   Q. You saw him about 12:30?   A. Yes,
sir.   Q. Did you see him after 12:30?   A. No, sir.   Q.
was he or not rational?   A. Yes, sir; at that time I
talked to him, and he talked pretty sensible; then I
left.   I left while he was awake.   Q. Was he or not
lapsing into irrationality when you left?   A. He was
wanting to go to sleep when I left.

### REDIRECT EXAMINATION.

"Q.   When you left him the last time, Doctor, at
12:30, he appeared to be rational; talked to you; knew
you and talked sensible?   A. Yes; he did that all right.
Q. Recognized who you were?   A. Yes, sir.   Q. Knew
who the others were in the room?   A. Yes, sir.   Q. Doc-
tor, you didn't see him from 8 until about 12:30?   A.
I saw him—from 8 to 12 I didn't see him."

We think the general condition of the deceased be-
tween the time of the surgical operation and his death
(which covered and included the time at which the
declaration was made), as shown by the testimony of
Dr. Luttrell, was such as to devolve upon the State the
burden of showing, by affirmative evidence, sufficient
mental capacity of the declarant to admit the declara-
tion.   There is an entire lack of evidence touching the

mental condition of the deceased at the precise time the declaration in question was made. As we have seen, Mr. Meyerhoff was asked the direct question as to whether the declarant was "rational and in his right mind" at the time he made the statement, and the witness replied: "I think that is a question for the jury, whether he was rational or not." And the statements of Mr. Meyerhoff which followed, in respect of what the declarant said and did, fall short of satisfactory evidence that Anderson had sufficient consciousness and intelligence to qualify him as a witness.

Furthermore, it is shown by the testimony of Mr. Meyerhoff that some other persons were present in the room at the hospital when the statement of deceased was made. In addition to Mr. Meyerhoff and Mr. Fred Houk, there were present in the room at the hospital when Anderson's statement was made Rev. Tom Sexton, Rev. Mr. Logan, J. S. Dallas, stepfather of deceased, and perhaps others, and these persons were not called as witnesses, and their absence is unexplained.

In the case of *Bell* v. *State*, 72 Miss., 507, 17 So., 232, it was said that, in passing on the competency of a dying declaration, the court should make full inquiry as to the circumstances, and, if necessary, require all witnesses capable of throwing light on the subject to be produced.

However, we do not undertake to sanction a rule which would impose upon the party offering a dying declaration in evidence the burden of producing as

130 Tenn. 20

witnesses all persons who were present at the time the declaration was made and who are available as witnesses at the time of the trial. We go no further than to hold that, where it is a matter of doubt as to whether the mental capacity of the declarant to make a dying declaration sufficiently appears, the failure of the party offering the declaration in evidence to produce available witnesses to the condition of the declarant at the time of the declaration, or to explain their nonproduction, is a circumstance which may be considered against the declaration, because the presumption is that competent and pertinent evidence within the knowledge and control of a party and withheld by him is against his interest and insistence. *Standard Oil Co.* v. *State,* 117 Tenn., 625, 100 S. W., 705, 10 L. R. A. (N. S.), 1015.

The second objection offered to the admission of the dying declaration is based upon the claim that it was not the statement of Ben Anderson, but was a statement previously made in writing by the witness John Gorman.

Mr. Meyerhoff testified that, at the time he took the testimony of Ben Anderson, he had in his possession a written statement signed by John Gorman, which had been prepared by or at the dictation of Gorman, and which statement he read to the deceased. Mr. Meyerhoff's testimony relating to the manner in which the statement of Anderson was obtained by the witness is as follows, viz.:

"Q. Mr. Meyerhoff, did you read over a paper to Anderson before he made this statement to you? A.

Jollay v. State.

Now, General— Q. Just answer my question. A. You mean in its entirety? Q. Did you read a written statement to Ben Anderson? A. Not in its entirety; no, sir. Q. What part of it did you read? A. I read the part that is given— Q. Who made that statement? A. It was reported to have been made by J. A. Gorman. Q. Did you or not take a written statement made by J. A. Gorman, or parts of it, and ask if that was true? A. I will explain— Q. Just answer my question. A. I can't answer without explaining it. Q. Did you or not ask him if that statement was true? A. I will have to explain in order to answer that question. The Court: You will have to answer 'Yes' or 'No,' then make your explanation. Q. Did you or not read over the written statement made by John Gorman to Ben Anderson, or parts of that written statement made by John Gorman to Ben Anderson, and ask if these statements were true? A. I did, by sentences. Q. And he said they were? A. He did; he not only said that, but adopted that statement as his dying declaration.

•    •    •    •    •    •    •    •    •    •    •

"Q. Mr. Meyerhoff, at the time you went out to take this statement from Ben Anderson at the hospital, state whether or not you told him that you had a written statement of the trouble signed by John Gorman. A. I did, General; at least what purported to be a statement signed by John Gorman. Q. You read different paragraphs to Ben Anderson, a paragraph at a time from that statement? A. Yes, sir; I did. Q. And he

knew that was a statement made by Gorman from which you were reading? A. He did, and was so told at the time. Q. And on his answers to you after you read these paragraphs of Gorman's statement you based your statement with reference to what he said as to how the trouble happened; is that right? A. To an extent, that is correct.''

The fact that statements made by a declarant as a dying declaration are elicited by means of leading questions addressed to the declarant is not sufficient to exclude the declaration. Upon this proposition the authorities are practically unanimous. But, aside from this rule, which may be justified upon the same ground underlying the admission of dying declarations generally—to wit, necessity—the rule is that the testimony of the declarant, to be admissible in evidence, must be such as the declarant could have testified to if he had been called upon to give testimony in court. We hardly think it would be contended that a witness could properly testified in open court simply by adopting the written testimony of another witness, even though it was read over to him ''sentence by sentence.''

It seems to us there is a marked distinction between this method of obtaining a statement from a dying man and that of obtaining a statement by means of what are ordinarily termed ''leading questions.''

However, it is not necessary to decide this latter question, because we think the statement of Ben Anderson offered as a dying declaration should not have been admitted to the jury, for the reason that it does

not sufficiently appear that Anderson had sufficient consciousness and intelligence to make the declaration understandingly.

In this connection, we wish to disclaim any purpose to so much as intimate that either Mr. Meyerhoff or Mr. Fred Houk was actuated by any improper motive or was guilty of conduct deserving criticism, in relation to the matter of obtaining a statement from the deceased.

Believing, as we do, that the statement of the deceased was erroneously admitted in evidence, it becomes necessary to determine whether this error was prejudicial to the plaintiff in error, or affected the result of the trial. It should be remembered, as already pointed out, that there was much evidence before the jury offered by the defendant below tending to impeach and weaken, if not to destroy, the testimony of John Gorman and Mrs. Kelly. It is impossible for us to say how much credit the jury gave to Gorman and Mrs. Kelly, or to what extent the testimony of Gorman and Mrs. Kelly was weakened in the minds of the jury by the impeaching testimony offered on behalf of defendant below. It may be that the dying declaration of Ben Anderson turned the scale in favor of the State. We do not know what influence the statements of the deceased, as proven by Mr. Meyerhoff, had upon the jury. Prof. Wharton, in his valuable textbook on Criminal Evidence (10th Ed., vol. 1, p. 529), says, viz.:

"Dying declarations have every element of dramatic evidence. As the last utterances of a sentient, con-

Jollay v. State.

scious being, standing on the threshold of eternity, they possess an impressiveness out of all proportion to their evidentiary value. In all homicide cases, the elemental passions are at any moment apt to override the judgment. A court may be judicial and impartial, and a jury dispassionate, up to the point where the dying declaration is admitted, and then find its impartiality and selfrestraint seriously tried over the recital of the dying declaration.''

We think the admission of the alleged dying declaration in this case constitutes reversible error for which the plaintiff in error is entitled to a new trial.

Other errors are assigned, but we do not think that the matters upon which they are based are, if error at all, of sufficient importance to call for the reversal of the judgment.

However, the judgment will be reversed because of the error committed in the admission, as a dying declaration, of the statement of the deceased, Ben Anderson, and the case will be remanded to the criminal court of Knox county for a new trial.