HARRY BAUER, Complainant, Appellee, v. MUTUAL
OF OMAHA INSURANCE COMPANY, Defendant,
Appellant. —460 S.W.2d 366.

Eastern Section. August 5, 1969.

Certiorari Denied by Supreme Court January 19, 1970.

190

Goins, Gammon, Baker & Robinson, Chattanooga, for defendant, appellant.

Marvin Berke, Chattanooga, for complainant-appellee.

McAMIS, P. J. This is a suit upon a policy of disability insurance dated May 10, 1966, providing benefits of $300.00 per month in event insured should become totally and permanently disabled.

The insurer, by its answer, defended on the ground the application submitted by complainant contained misrepresentations as to his condition of health and, particularly, that he falsely represented he had completely recovered from an operation to remove or repair a herniated spinal disc, performed in 1960. The jury made specific findings including a finding that insured is totally and permanently disabled.

Included in the interrogatories submitted to the jury were the following:

"Were all answers listed upon the application for insurance true and complete to the best of complainant's knowledge and belief?" Answer: "No"

"If your answer to the above interrogatory is 'No' state whether or not such misrepresentation was made with actual intent to deceive." Answer: "Was not."

On these findings a decree was entered covering disability benefits up to October 1, 1968. The penalty was disallowed on a jury finding that defendant had not acted in bad faith in denying liability.

Defendant has appealed and assigned as its first ground for reversal that the Chancellor should have dismissed the bill on the finding of the jury that the application contained false answers material to the risk. There is no assignment that insured was not permanently and totally disabled.

We quote the material portions of the application:

"Have you * * * ever had, or been told you had * * * any symptoms of ill health?" Answer "No."

"Have you * * * had any physical examinations during the past five years?" Answer: "None."

"Have you * * * ever had * * * any physical conditions or injuries not listed above? (Give details in 5 below) Answer: "No."

Under 5 the Application contains the following:

"Disc removed 1956 no trouble since. Degree of recovery complete—attending physician Dr. D. Sweeney Birmingham, Ala."

(The operation mentioned was actually performed in 1960 rather than 1956.)

The principal issue before the jury was whether insured had completely recovered on May 10, 1966, the date of the application, from the disc operation, as represented in the application for insurance.

T.C.A. 56-1103 provides:

"No written or oral misrepresentation or warranty therein made in the negotiations of a contract or policy of insurance, or in the application therefor, by the insured or in his behalf, shall be deemed material or defeat or void the policy or prevent its attaching, unless such misrepresentation or warranty is made with actual intent to deceive, or unless the matter misrepresented increases the risk of loss."

The insurer paid benefits for a number of months after insured found it impossible to continue working as superviser with General Electric Company in Chattanooga, following an automobile accident August 4, 1966. Benefit payments were discontinued after a few months when the Company, according to its insistence, learned for the first time that insured over the years prior to the date of the application had consulted and had been treated by certain doctors in Chattanooga and in Birmingham where insured was formerly employed. It becomes necessary to consider in some detail the testimony of these doctors.

Dr. Eyssen was consulted by insured August 2, 1966, two days before the automobile accident, for what the doctor called muscular spasm or back sprain which occurred while insured was bowling. He again saw him on August 5, 1966, the day after the accident. The doctor testified "he had reinjured his back and with pain radiat-

ing down his right leg.'' He was referred to Dr. Mc-Cravey, to be checked ''neurologically''.

Dr. Sweeney of Birmingham who performed the disc operation in 1960 testified that he felt insured made ''a very satisfactory recovery'' following the operation and that he was allowed to return to work two months later but with instructions not to engage in ''heavy lifting, constant bending and straightening, and any twisting movement.'' In August 1966 he found him suffering with low back pain with radiation down his right leg and performed a laminectomy involving L4-5 interspace. He found the root nerve was scarred and ''there was a small amount of degenerative disc material present.'' The date of this operation was September 23, 1966. The area involved in this operation was L4-5, the same as involved in the first operation of 1960 and also the same area where he had found insured was having pain in the back, radiating down the right leg in 1960. A myelogram at that time revealed ''a large filling defect at the L4-5 interspace on the right side.''

In 1961 insured was complaining of low back pain in the area of L4-5 and Dr. Sweeney advised him to stop bowling and engage in some other type of exercise. He saw him again in March, 1966, two months before the date of the application for insurance, when he was complaining of pain in his right leg ''nothing sharp''. Insured told the witness at that time he had been having leg pains for 6 or 7 months following an automobile accident and had been under the care of Dr. Thompson who had prescribed a back brace. This was the same leg ''that the radiation problem had been causing radiation into''. Dr. Sweeney then said the complaints after the accident of

August 4, 1966, were "complaints of the L4-L5 nature", complaining of pain in his back radiating into his leg—a recurrent disc", meaning that a fragment of disc material was present in the same joint as his former disc problem.

Dr. Waters of Chattanooga, a witness for defendant, saw insured on March 1, 1965 and August 12, 1965, and was told of the operation by Dr. Sweeney in 1960. He complained at that time of a pulling sensation down his leg but had "full flexion on bending forward, extension, bending backward, and extension bending toward the right or left side in a standing position" and normal reflexes. His impression was the pain in his right hip region after bowling was "probably" due to "scarring of the tissue surrounding the nerve where he had his ruptured disc."

Dr. Thompson, an orthopedic surgeon called by defendant, saw insured on January 4, 1966, some months before the application for insurance. He found a narrowing of the interspace between the fourth and fifth lumbar vertebrae and advised insured his pain was due "to a degeneration of the disc space".

Dr. Thompson explained that the disc between lumbar vertebrae separate one from the other, serving as a cushion, and that in some cases "maybe five, ten or fifteen years" after disc surgery the disc will gradually degenerate causing the vertebrae to become closer together. We quote from Dr. Thompson's testimony following this explanation:

"I advised the patient at this time that his symptoms were secondary to a degeneration of the disc space. He was given a prescription for Indocin, which is a non-

narcotic, and an antirheumatoid type drug for painful backs * * * Advised him in the use of a firm mattress, fracture boards, and to return in approximately a month for further evaluation and fitting of a low back brace if he continued to have trouble.''

Dr. Thompson testified insured returned on February 22, 1966. Apparently he left the impression with Dr. Thompson he had been using a back brace with some relief. He was requested to return in a month but failed to do so.

On cross examination Dr. Thompson said insured ''could be strong and healthy'' with the condition he had described and possibly could play in a bowling tournament but on re-direct he said:

''At the time I saw him he was in trouble and had been for several months. The process that I saw in his back had been going on for several years at the least and irrespective of what he may have done off and on and may do off and on now for the period of the rest of his life he has a bad back * * * that is going to give him trouble until something is done to improve it.

''He may have some good days but he has a degenerative disk space and he has rubbing against bone, the washer is gone, and he is going to have trouble.''

When asked to state the action a medical examiner knowing of occasional use of diathermy, Dr. Thompson replied:

''Let me put it this way, if I were a medical examiner for an insurance company or one of your industrial plants and I had a patient making application for work that required anything other than light work, I would feel

that this patient would have to have X-ray for me to give a good substantial evaluation of him, regardless of his history.''

Dr. Sims, a defense witness, saw insured on January 13, 1964, when he was having pain in the lower portion of his back, also some difficulty with his stomach, suggestive of ulcer. He later saw him several times during 1964 prior to June of that year but his complaints at these times were throat infection and ulcer type pains not related to his back. However, on June 22, 1964, he complained of his back for which diathermy and a muscle relaxant were prescribed. On August 25, 1964, he was seen with acute back pain and was given diathermy, described as a shortwave heat treatment with a heat lamp.

On October 16, 1964, he was examined and treated by Dr. Sims for ''pain in the right side of his lower back with some associated dizziness * * * stated that he tired easily'', made some reference to his legs and gave a history of disc surgery some years before.

After two or three visits for other unrelated complaints, insured again consulted Dr. Sims on February 25, 1965, for back pain with radiation into the leg. At that time he was referred to a neurosurgeon. In March, 1965, he returned with back pain and was given a narcotic for pain relief and diathermy. His next visit was on August 11, 1965, with back pain in the lower back, saying he had been bowling and his back pain followed. He was given a muscle relaxant and the sacroiliac joint was injected with Cortisone, a treatment known as a ''nerve block''. He was again seen by Dr. Sims and this treatment was repeated with the recommendation that insured go to a hospital. In December, 1965, he was referred to Dr. Thompson whose testimony has been summarized above.

Dr. Sims again saw insured January 14, 1966, for ulcer symptoms, on March 11, 1966, for a "sinus respiratory-type thing" with no further visits until after the application was signed on May 10, 1966.

Dr. Dietz, a witness for defendant, saw insured before the operation of 1960 and a number of times between March 7, 1960, the date of the disc operation, and 1964, for a variety of complaints including an automobile accident, upset stomach, chest pain, abdominal cramps and rapid heart. Dr. Dietz's description of insured's back symptoms before the 1960 operation are quite similar to the symptoms described by Doctors Eyssen, Thompson and Sims in the period of a year or more before the date of the application for insurance.

The record shows that insured's back symptoms continued after the automobile accident of August 4, 1966, but in such aggravated form that a second operation was performed involving L4-L5 vertebrae and that, following that operation, his back condition continued to deteriorate to the point he was compelled much against his will to give up his employment. He now suffers constant pain in his back requiring constant and continued use of drugs to alleviate pain.

While insured had a good work record preceding the application for insurance and actively bowled, the foregoing medical proof indicates he was often forced to seek medical aid and was repeatedly examined and treated for his back condition. With the use of pain relievers he was able to continue his employment and sporting activities.

Running through all the medical testimony, especially after 1964, are repeated findings of lower back pain involving L4-5, the same area where the disc was repaired

by Dr. Sweeney in the operation of 1960. After 1964, as we have said, the symptoms are comparable to the symptoms of back difficulty before the operation of 1960. Apparently there was a time between 1960 and 1964 when insured was having little or no difficulty with his back. This is consistent with Dr. Sweeney's testimony that in a certain percentage of cases the patient following a disc operation has a degenerative disc five or more years following the operation. Apparently it was Dr. Sweeney's opinion insured was one of these cases.

We think a jury could well find from the proof that insured, contrary to his statement in the application, had not recovered from the operation of 1960 and that he had had trouble since—trouble which under the testimony of Dr. Sweeney above mentioned would have caused a medical examiner for insurance to X-ray insured's back before giving a favorable opinion. The testimony of Charles Burke, defendant's underwriter, is to the same effect. Mr. Burke testified that no company would issue a policy under the circumstances and particularly to an applicant with a degenerative disc.

The Chancellor expressly concurred in the findings of the jury but declined to dismiss the bill, we assume, on the ground insured's misrepresentation that he had completely recovered from the operation of 1960 and had since had no trouble was not material to the risk.

Under the statute, if material to the risk it can make no difference that the jury also found that the misrepresentation was not made with actual intent to deceive.

In Mutual Life Ins. Co. v. Dibrell, 137 Tenn. 528, 194 S.W. 581, the jury found that insured had falsely represented in his application that he had never been denied

insurance by any other company but, in another special interrogatory, found that in making this representation he acted in good faith. This case is closely analogous with no difference in principle. Here the jury found the insured misrepresented that he had completely recovered from the 1960 operation with no trouble since but that this representation was not made with actual intent to deceive.

In the case cited, the Supreme Court held the misrepresentation found by the jury was material to the risk and that insured could not recover notwithstanding the finding of the jury that he acted in good faith. We quote:

"Under a separate issue submitted to it, the jury found that the subject-matter of question 20, quoted above, (relating to other applications being denied) was regarded by the insurance company as material to the risk, in point of fact; and the proof made by appellant's medical director was to the effect that, had deceased truthfully related the facts touching previous examinations and nonissuance of the policies so applied for, the policy in suit would not have been issued."

As held in the case cited, we come finally to the question, was the misrepresentation found by the jury and Chancellor material to the risk and such as would naturally and reasonably affect the judgment of the insurer?

In view of Jundge Cooper's opinion ably and exhaustively reviewing Tennessee decisions in the recent holding of this court in Sloop v. Mutual of Omaha, 55 Tenn. App. 656, 404 S.W.2d 265, we see no need to do more than call attention to the well established rule making the

materiality of a misrepresentation once found to have been made a question of law for the Court. As there said:

" 'It is the duty of the insured when he signs an application or accepts the policy, if he knows or has any reason or ground to believe that he has any disease or is in unsound health, * * * [to make a fair disclosure of the facts to the insurer. Knights of Pythias v. Rosenfield [Rosenfeld] 92 Tenn. 508, 22 S.W. [204] 504; Harris v. [Security Mut. Life] Insurance Co., 130 Tenn. 305, 170 S.W. 474, [L.R.A. 1915C, 153].' Norvill v. Mutual Benefit Health & Accident Ass'n, 14 Tenn.App. 396; Little v. Washington National Ins. Co., 34 Tenn.App. 593, 241 S.W.2d 838.''

 It is clear from the record that insured having consulted physicians numerous times over a period of years for pain in his lower back knew he had a serious back condition and for that reason was not in sound health. All of this was withheld from the insurer and, as confirmatory of the representation that insured had completely recovered from the operation with no subsequent trouble, the insurer was told the applicant had not been examined by a physician and was not told of any symptoms of ill health for the past five years.

Under all the proof we can not escape the conclusion that the misrepresentation was material to the risk and such as would naturally and reasonably affect the judgment of the insurer.

We are also of opinion the insurer did not waive its right to rely on this misrepresentation. The Chancellor made no finding on this issue apparently because not necessary to a decision under his view that the misrepresentation was not material to the risk.

During the period of a few months that the Company made payments of benefits under the policy it did not have the facts relative to the misrepresentation. On the contrary, insured in filling out proofs of loss dated October 7, 1966, October 18, 1966, and July 24, 1967 continued to withhold from the Company all of the information above summarized of numerous consultations with physicians over the years before the date of the application. In these proofs he was asked:

"Have you had any medical or surgical advice during the past five years for any other condition (meaning other than the back injury sustained in the accident of August 4, 1966)?"

To this question insured answered "Flu."

In view of the misrepresentation contained in the application and repeated in the proofs of loss that insured had not consulted a physician over a long period of time both before and after the policy was issued we can not see that the insurer was derelict in failing to look for proof to the contrary by hunting for a physician who had examined insured. The insured can not complain because his action in withholding information blinded the insurer to the truth. We quote, as apropos here, from Jefferson Standard Life Ins. Co. v. Webb, 56 Tenn.App. 314, 406 S.W.2d 738:

"Counsel for defendant-in-error insists that the insurer is estopped to rely upon its defense in this case, since it made no effort to ascertain the condition of the health of the child, despite the fact that the name of the attending physician, Doctor Taber, was listed in the application and permission given to obtain pertinent information from him.

"We cannot agree with this contention. Since the answers given to the above quoted questions were negative, why was it necessary for the insurer to consult Doctor Taber, since by the answers to the questions, the parents had told the insurer that their child was in good health and free from any deformity, physical or mental defects?

"We think the insurer could only be expected to consult the physician in the event the parents disclosed some fact which made it advisable to do so before issuing the policy, or in the event the child appeared to be unhealthy."

It results that the decree of the Chancellor must be reversed and the suit dismissed. Costs will be adjudged to complainant.

Cooper and Parrott, JJ., concur.